# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Timothy Brown, Ronnie Suveg, and Joseph Bobertz on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>United Parcel Service of America, Inc., the Administrative Committee of the UPS Retirement Plan, the Administrative Committee of the UPS Pension Plan, and John/Jane Does 1-20,<br><br>　　　　　　Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Timothy Brown, Ronnie Suveg, and Joseph Bobertz, by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following:

## INTRODUCTION

1.　　This is a class action against Defendants, United Parcel Service of America, Inc. ("UPS"), the Administrative Committee of the UPS Retirement Plan,

1

the Administrative Committee of the UPS Pension Plan f/k/a the Board of Trustees (the "Committees"), and the individual members of those Committees (collectively the "Defendants"), concerning the failure to pay benefits in amounts that are actuarially equivalent to a single life annuity to participants and beneficiaries receiving a joint and survivor annuity ("JSA") as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"). By not offering JSAs that are actuarially equivalent to the single life annuities that participants earn under the UPS Retirement Plan ("Retirement Plan") and the UPS Pension Plan ("Pension Plan") (collectively the "Plans"), Defendants are causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      UPS is one of the largest employers in the United States and sponsors several defined benefit pension plans for its employees.   Under the Plans, participants earn retirement benefits in the form of a single life annuity ("SLA"), or a monthly payment for the rest of their lives when they retire.

3.      Participants in the Plans may choose to receive their benefits in forms other than an SLA, including, a JSA, which provides an annuity during the participant's life and then a percentage of that amount to the participant's beneficiary after the participant's death (available in 50%, 75%, or 100% amounts).

4.      To calculate the amounts of a JSA, actuarial assumptions are applied to determine the present value of the future payments.  These assumptions are based on a mortality table — to predict how long the participant and beneficiary will live — and interest rates to discount the expected payments.  The mortality table and interest rate *together* are used to calculate a "conversion factor" which determines the benefit amount that would be equivalent to the SLA the participant accrued.  The present values of a JSA and the SLA must be equal for them to be "actuarially equivalent."

5.      Mortality rates have generally improved over time with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations. Older morality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables. As a result, using an older mortality table to calculate a conversion factor decreases the present value of a JSA and — interest rates being equal — the monthly payment retirees receive.

6.      The interest rate also affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of benefits in forms other than an SLA.

7.      Defendants calculate the conversion factor (and thus the value of the JSA offered to participants when they retire) using mortality assumptions from the 1980s.  By using outdated mortality rates, Defendants depress the present value of the benefits received as a JSA, resulting in monthly payments that are materially *lower* than they would be if Defendants used reasonable, up-to-date actuarial assumptions.  Defendants use outdated mortality assumptions to pay benefits even though they use current, updated assumptions in their audited financial statements to calculate the benefits they expect to pay retirees.

8.      By using outdated mortality assumptions, Defendants caused Plaintiffs, Timothy Brown, Ronnie Suveg, and Joseph Bobertz, who worked for UPS for more than 30, 25, and 34, years, respectively, to unknowingly forfeit part of their retirement benefits in violation of ERISA.  These improper reductions caused Plaintiffs to receive less than they should each month, reducing the present values of each of their benefits by thousands of dollars.

9.      Accordingly, Plaintiffs seek an Order from the Court reforming the Plans to conform to ERISA, payment of future benefits in accordance with the reformed plans, as required under ERISA, payment of the amounts improperly withheld, and such other relief as the Court determines is just and equitable.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the ERISA.

11.     This Court has personal jurisdiction over UPS because it is headquartered and transacts business in, or resides in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and UPS resides in and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because UPS does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

13.     Plaintiff Timothy Brown is a Participant in the Retirement Plan who worked for UPS for over 31 years until his retirement in 2014.  He is currently receiving a 100% JSA, with his spouse as the beneficiary.

5

14.    Plaintiff Ronnie Suveg is a Participant in the Retirement Plan who worked for UPS for over 25 years until his retirement in 2014. He is currently receiving a 75% JSA, with his spouse as the beneficiary.

15.    Plaintiff Joseph Bobertz is a Participant in the Retirement Plan who worked for UPS for over 34 years until his retirement in 2018. He is currently receiving a 50% JSA, with his spouse as the beneficiary.

**Defendants**

16.    UPS is "the world's largest package delivery company," providing logistical services that include transportation, distribution, and freight. Its headquarters and principal place of business is Atlanta, Georgia.

17.    UPS sponsors the Plans and has the right to amend or terminate them. *See* Retirement Plan Document at § 7.1; Pension Plan Document at § 10.1.

18.    Upon information and belief, the Committees are unincorporated associations based in Atlanta, Georgia.   The Committees have fiduciary responsibilities for the administration and operation of the Plans.   They are fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or control respecting the management of the Plans and authority of control respecting the management or

disposition of the Plans' assets.  The Committees are also Administrators of the Plans within the meaning of ERISA 3(16), 29 U.S.C. § 1002(16).

19.    John/Jane Does 1 through 20 are the individual members of the Committees, or any other committees or entities responsible for administering the Plans.  Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

20.    ERISA provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." 29 U.S.C. § 1054(c)(3) (emphasis added). There are several forms of pension benefits that are subject to this requirement, including those Plaintiffs receive.

21.    ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment, making the QJSA the default benefit for employees who are married. *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

7

22.     ERISA defines a QJSA as an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.   ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).   For example, if a participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month after the participant's death. A QJSA must be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b). The definition of QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1).

23.     Pension plans must also offer participants at least one other form of survivor annuities, known as qualified optional survivor annuities ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g). A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%.   ERISA requires that QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).   The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2).

24.    ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age. ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

25.    Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205 concerning alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001; *see also* ERISA § 3002(c); 29 U.S.C. § 1202(c).

26.    The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[1] Indeed, a QJSA "must be as least as valuable as any other optional form of

---

[1]    26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."    26 C.F.R. § 1.401(a)-11(b)(1)(i).

benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16; *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ("All other optional forms of benefit payable to the participant must be compared with the QJSA using a single set of interest and mortality assumptions that are reasonable and that are applied uniformly with respect to all such optional forms payable to the participant . . . ."). The regulations require these requirements regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

27. ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rate (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

---

[2]     *See* 26 C.F.R. § 1.430(h)(2)-1.
[3]     *See* 26 C.F.R. § 1.430(h)(3)-1.

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

28.     "Two modes of payment are actuarially equivalent when *their present values are equal* under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[4]  Actuarial equivalence should be "cost-neutral," meaning that neither a plan nor the participants should be better or worse off if a participant selects an SLA or a JSA.  *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (S.D. Fla. 2005).

29.     Under ERISA, "present value" must "reflect anticipated events."  Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

(a)     The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

---

[4]     According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.   "Equal"   means   the   "same."   https://www.merriam-webster.com/dictionary/equal

(b)   A plan must determine optional benefits using "a single set of *interest and mortality assumptions that are reasonable* . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)   The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using *reasonable actuarial assumptions*." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d)   With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using *reasonable actuarial assumptions* . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

30.   The Regulations also rely on the standards of the American Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability"). Like the Regulations and the ERISA present value definition, the SOA requires actuaries to use "reasonable assumptions." Actuarial Standard of Practice No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

31.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "*special attention must be paid to the actuarial assumptions underlying the computations*." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018).   As the court explained in *Dooley v. Am. Airlines, Inc.*, each actuarial assumption used to calculate QJSAs, QOSAs and QPSAs must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity.  The term actuarially equivalent means equal in value to the present value of normal retirement benefits, *determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate*.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at *10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

## SUBSTANTIVE ALLEGATIONS

## I.     Applicable Terms of the Plans.

### A.     The Retirement Plan

32. UPS established the Retirement Plan on September 1, 1961. The Retirement Plan covers the eligible employees of UPS and certain of its subsidiaries, termed "Employer Companies." *See* Plan Document at § 1.01(aa) and at Appendix H. The Retirement Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

33. Participants earn retirement benefits as a percentage of their compensation, how many years they worked for UPS, and a point system depending on when their respective Employer Company began participating in the Retirement Plan ("Final Average Pay Formula"). Retirement Plan Document at § 5.2. Under the Final Average Pay Formula, participants earn benefits as an SLA. *Id.*

34. The Retirement Plan's QJSA, and the default form of benefit for married participants, is a 50% JSA. For unmarried participants, the default form of benefit is a SLA for participants who began working for UPS after January 1, 1992, and a 10 year life and certain annuity ("10YCLA") if the participant started working for UPS before January 1, 1992. The Retirement Plan also offers a 75% JSA and a 100% JSA as QOSAs. Retirement Plan Document at § 5.04(d).

35.    The Retirement Plan states that the QJSA and the QOSAs are the "Actuarial Equivalent of the Participant's benefit payable in the Normal Form." Retirement Plan Document at § 5.04(d)(i).

36.    The Retirement Plan defines the term "Actuarial Equivalent" as:

> [A] benefit in the aggregate equality in value to the amounts expected to be received under the Normal Form of benefit based upon an interest rate of 6% and the 1983 GAM Mortality Table for Males for Participants and the 1983 GAM Mortality Table for Females for Beneficiaries and Alternate Payees.   ("1983 GAM/6%").

*See* Retirement Plan Document at § 1.1(b)(i).

37.    UPS uses the 1983 GAM/6% to calculate the 10YCLA option for participants in the "Retirement Plan for Employees of Overnite Transportation" ("Grandfathered Overnite Participants"), which merged into the Retirement Plan. For the 50% and 100% JSA options, however, Grandfathered Overnite Participants receive the greater of the amount calculated using the 1983 GAM/6% or the UP 1984 Unisex Pension Mortality Table and a 7% interest rate ("UP-84/7%").  *See* Retirement Plan Document at § 1.01(b)(ii)(B)(1).

38.    UPS uses the 1983 GAM/6% to calculate the 10YCLA option for participants in the "Motor Cargo Plan" ("Grandfathered Motor Cargo Participants"), which merged into the Retirement Plan.  For the 50% JSA, 100% JSA and 5YCLA, however, Grandfathered Motor Cargo Participants receive the greater of the amount

calculated using the 1983 GAM/6% or the UP 1984 Unisex Pension Mortality Table and an 8% interest rate ("UP-84/8%").

39.     Effective January 1, 2008, eligible employees hired, re-hired or transferred into the Retirement Plan accrue benefits under a cash balance formula called the "Portable Account Formula."  *See* Retirement Plan Document at § 5.3(g). Under the Portable Account Formula, UPS contributes a percentage of the participant's compensation to a hypothetical account ("Portable Account") in the Retirement Plan which accumulates interest.  *Id*.

40.     Participants who earn a benefit under a Portable Account Formula may receive their benefits in a lump sum equal to the value of their Portable Account. *See* Retirement Plan Document at § 5.4(h).  They may also receive their benefits as an SLA, 50% JSA, 100% JSA and, if eligible, any of the Retirement Plan's other optional forms of benefits.  *Id*.  If participants receive their benefits as an annuity, their Portable Account is first converted to an SLA using the Treasury Assumptions. *Id*. at § 5.4(h)(ii).  If participants receive another form of an annuity, including a 50% JSA, 75% JSA, or 100% JSA, the 1983 GAM/6% is used to convert their SLA to these other forms.  *Id*.; *see also* § 1.1(b)(i).

**B.     The Pension Plan**

16

41.    UPS established the Pension Plan on January 1, 1973.  The Pension Plan covers the eligible employees of UPS and its subsidiaries and affiliates that adopt the plan.  The Pension Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

42.    Participants in the Pension Plan earn retirement benefits under a Final Average Pay Formula as an SLA.  *See* Pension Plan Document at §§ 3.3, 4.1.

43.    The "normal form" of benefit for a single participant in the Pension Plan is an SLA.  For married participants, the "normal form," and the Pension Plan's QJSA, is a 50% JSA, which the Plan Document states "shall be the Actuarial Equivalent of [a participant's SLA]."  *See id.* at § 4.11.

44.    Participants can also receive their retirement benefits as a 75% JSA, 100% JSA or a 10YCLA.  *See* Pension Plan Document at § 4.11(b).  According to the Pension Plan Document, each optional form of benefit "will be the Actuarial Equivalent to the Participant's [SLA]."  *Id*.

45.    UPS uses the 1983 GAM/6% to convert the SLA to the QJSA or one of the forms of optional benefits for participants hired after 2007.  *See* Pension Plan Document at § 1.1(a)(1).  Participants hired before 2007 who worked for UPS after 1990 who select a QJSA receive the greater of: (a) the amount calculated using the

17

1983 GAM/6%; or (b) 88% of the SLA during the life of the participant (with adjustments for the age difference between the participant and the spouse).  *See* Pension Plan Document at 1.1(a)(2)(i).  Participants hired before 2007 who worked for UPS after 1990 who select the 75% JSA, 100% JSA or a 10YCLA have their benefits calculated using the 1983 GAM/6%.

46.    For participants who are Grandfathered Overnite Participants or Grandfathered Motor Cargo Participants, UPS uses the same actuarial assumptions as described in ¶¶ 37 and 38, above.

## II.    The Plans' JSAs Are Not Actuarially Equivalent to the SLAs Participants Earned.

### A.    Converting an SLA to Other Forms of Benefits.

47.    To convert an SLA into another form, the present value of the ***aggregate*** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under both the SLA and the other form must be determined.[5]  The present values are then compared to determine the conversion factor.[6]  There are two main components of these present value calculations: an interest rate and a mortality table.

---

[5]    As alleged above, a QPSA is the survivor annuity portion of a plan's QJSA.
[6]    The conversion factor is easily calculated by a computer model.  Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

48.    An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

49.    The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

50.    Pursuant to para. 3.6 of Actuarial Standard of Practice No. 27 ("ASOP 27"), promulgated by the Actuarial Standards Board,[7] "each economic assumption used by an actuary should be reasonable."[8] An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the **measurement date**,"

---

[7]    Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[8]    Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on January 21, 2020).

and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original). The Treasury Interest rates are reasonable because they reflect current economic conditions.

51.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

52.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to the population's mortality experience.

53.     Since at least the 1980s, the life expectancies in mortality tables have steadily improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

54.    Pursuant to para. 3.5.3 of Actuarial Standard of Practice 35,[9] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[10]

55.    Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was

---

[9]    *See* n. 9, *supra*.
[10]    *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement (last accessed on January 21, 2020).

the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality. IRS Notice 2016-50.[11]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[12]

56.      For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002 (27).  The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).  Accordingly, the Treasury Assumptions are reasonable.

57.      Using a reasonable interest rate and mortality table, the present value of the SLA and the QJSA or QOSA can be compared to determine whether the amount of the QJSA or QOSA is actuarially equivalent to the SLA.

58.      Changes to interest rates or mortality assumptions can have dramatic effects on the conversion factor and the value of a JSA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a JSA decreases.

---

[11]     *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.
[12]     *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

59.     Plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.     The Actuarial Assumptions That UPS Uses to Calculate the Plans' Liabilities Are Significantly Different Than Those Used to Calculate JSAs**

**1.     UPS Uses Updated Actuarial Assumptions to Calculate Its Financial Obligations to Pay Benefits**

60.     UPS's audited financial statements are prepared under Generally Accepted Accounting Principles ("GAAP") and filed with the SEC as Form 10-k. Under GAAP, mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[13] In its Form 10-k, UPS uses

---

[13]     As noted in an October 2015 "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their

reasonable, current mortality assumptions to calculate the present value of its benefit

obligations under the Plans. In its Form 10-k for the year ending December 31, 2014,

UPS began using the most recently published mortality tables, recognizing the well-

documented improvements to mortality. UPS's 10-k for that year states:

> The Society of Actuaries' ("SOA") published mortality tables and improvement scales are used in developing the best estimate of mortality for plans in the U.S. On October 27, 2014, the SOA published updated mortality tables and an updated improvement scale, both of which reflect longer anticipated lifetimes. ***Based on an evaluation of these new tables and our perspective of future longevity, we updated the mortality assumptions for purposes of measuring pension and other postretirement benefit obligations at December 31, 2014***. The change to the mortality assumption increased the year-end pension and other postretirement benefit obligations by $1.119 billion and $51 million, respectively. At December 31, 2014, we also revised the retirement assumptions for non-union plan participants based on recent retirement experience. The change to the retirement assumption decreased the year-end pension and other postretirement benefit obligations by $383 and $234 million, respectively.[14] (Emphasis added.)

---

mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

See Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf (last accessed January 21, 2020).

[14]    *See* UPS's Form 10-k for the year ending December 31, 2014 at 75, available at: https://www.sec.gov/Archives/edgar/data/1090727/000109072715000008/ups-12312014x10k.htm

61.     UPS has consistently updated the mortality assumptions it uses to calculate the present value of its benefit obligations in its 10-k filed with the SEC.

62.     UPS's 2016 10-k states:

> The Society of Actuaries ("SOA") published mortality tables and improvement scales are used in developing the best estimate of mortality for U.S. plans. In October 2016, the SOA published an updated improvement scale which reduced expected mortality improvements from previously published scales. Based on our perspective of future longevity, *we updated the mortality assumptions to incorporate this updated scale for purposes of measuring pension and other postretirement benefit obligations at December 31, 2016.*[15] (Emphasis added.)

63.     Similarly, in its Annual Report for Shareholders for 2018, UPS again updated the mortality assumptions used to measure its liabilities for the Plans based on the SOA's publication of a new mortality improvement scale.[16]

64.     UPS's methodology to determine the discount rate used to determine the actuarial present value of benefits accrued under the Plans is also consistent with ASOP 27 and reflects current economic conditions.  UPS uses a "bond matching approach to select specific bonds that would satisfy [its] projected payments," which UPS "believe[s]…reflects the process [it] would employ to settle" its pension

---

[15]     *See* UPS's Form 10-k for the year ending December 31, 2016 at 83, available at: https://www.sec.gov/Archives/edgar/data/1090727/000109072717000011/ups-12312016x10k.htm
[16]     *See* UPS Form 10-k for year ending December 31, 2018 at 91, available at: http://www.investors.ups.com/static-files/59a587c5-44b6-4afc-92a0-7a8cf6786517.

obligations under the Plans.[17] The discount rates UPS used to calculate the actuarial present value of the Plans' liabilities since 2013 are shown in the chart below.[18]

| Year | Discount Rate |
|------|---------------|
| 2013 | 4.42% |
| 2014 | 5.32% |
| 2015 | 4.40% |
| 2016 | 4.86% |
| 2017 | 4.41% |
| 2018 | 3.84% |

65.   The discount rates that UPS used based on its "bond matching approach" were consistent with similarly sized companies' discount rates and consistent with the common indices such as the FTSE and the Mercer Above Mean Curve that plan sponsors use as a benchmark to determine the discount rate they will use.

### 2.   The Plans Use Unreasonable Assumptions to Calculate JSAs, Reducing Participants' Benefits in Violation of ERISA.

66.   Throughout the Class Period, UPS used:

a.   The 1983 GAM/6% to calculate the JSAs and QPSAs under the Plans;

---

[17]   *See, e.g.*, UPS's Form 10-k for the year ending December 31, 2014 at 75.
[18]   *See* n. 16 and n. 17, *supra*, at 74 and 82, respectively; *see also* UPS's Form 10-k for the year ending December 31, 2013 at 74.

b.      The 1983 GAM/6% or the UP-84/7% to calculate the JSAs for Grandfathered Overnite Participants; and

c.      The 1983 GAM/6% or the UP-84/8% to calculate JSAs for Grandfathered Motor Cargo Participants.

67.    Defendants' use of these actuarial assumptions was unreasonable because the mortality tables are each outdated and do not "reflect anticipated events" (*i.e.*, the anticipated mortality rates of participants).  Indeed, in 2013, UPS used the RP-2000 — the most up-to-date mortality table at the time — to calculate its pension liabilities, based on an experience study it conducted regarding the Plans' participants and beneficiaries.  Thereafter, UPS began using the RP-2014, an even more modern mortality table, immediately after it was published by the SOA in 2014, to calculate its liabilities under the Plans.

68.    The 1983 GAM table that UPS uses to calculate participants' benefits is nearly ***40 years*** out of date, and as such, it overstates mortality rates. Under the 1983 GAM table, a 65-year-old male has an average life expectancy of 16.7 years and a 65-year-old female had an average life expectancy of 21.3 years. Using the RP-2014, however, a 65-year-old male has a life expectancy of 21.6 years, a 27.5% increase, and females have a life expectancy of 23.8 years, a 11.7% increase. Accordingly, the average retiring employee would have expected to receive, and the

average employer would have expected to pay, benefits for a substantially longer period of time than in 1983.

69.     Defendants exacerbated the differences between mortality rates in 1983 and today by using a male-only table for participants, which does not account for males' greater improvements in mortality over the past 40 years relative to females.

70.     Defendants' use of the UP-84 table to calculate JSAs for Grandfathered Motor Cargo Participants and Grandfathered Overnite Participants is similarly unreasonable because while the UP-84 table is unisex (i.e. comprised of males and females), it is still antiquated and overstates mortality rates compared to up-to-date actuarial tables.  The UP-84 table is even more out-of-date than the 1983 GAM, since it was published in 1976 and was based on data from the 1960s.

71.     By using outdated mortality assumptions, UPS materially reduces the monthly benefits that participants and beneficiaries receive in comparison to the monthly benefits they would receive if UPS applied updated, reasonable mortality assumptions.

72.     Defendants knew or should have known that the 1983 GAM and UP-84 tables were outdated and unreasonable and that using them produced lower monthly benefits for the Plans' participants and beneficiaries receiving JSAs calculated using these antiquated mortality tables.

73.     UPS used updated mortality tables in its financial statements throughout the Class Period.   In the audited financial statements, UPS used reasonable actuarial assumptions to report a greater liability for benefits than it was paying out using the unreasonable 1983 GAM/6%, 1983 GAM/7%, UP-84/7% and UP-84/8%.  There is no reasonable justification for Defendants to use old mortality tables that presume an early death and an early end to benefit payments to calculate an unfairly low annual benefit for participants, while at the same time using a reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting.

74.     Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

75.     Defendants also use these out-of-date assumptions despite using the reasonable Treasury Assumptions to convert participants' Portable Accounts to an SLA in the Retirement Plan.

76.     Further, UPS uses a more modern definition of "actuarial equivalence" when calculating JSAs in another defined benefit plan that it sponsors, the "UPS/IBT Full-Time Employee Pension Plan."  In that plan, UPS uses a 6% interest rate and the RP-2000 Mortality Table, adjusted for improvements through 2010.

77.     UPS updates the mortality assumptions used in its financial statements to predict for its shareholders the potential costs associated with the Plans based on the SOA's publications.  For its participants in those Plans, however, UPS continues to convert SLAs to other forms of benefits using old, outdated mortality assumptions, ignoring the SOA.  UPS incorporated the SOA's improved mortality scale from October 2016 into its 2016 Annual Report but has not updated the definition of "actuarial equivalence" in the Plans, even though it amended the Retirement Plan numerous times and restated the entire plan in 2006, 2010 and 2014.

78.     Had the Plans used reasonable actuarial assumptions, such as the Treasury Assumptions, Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

79.     Plaintiff Timothy Brown retired at age 55 and accrued an SLA of $3,301.35 per month.  He selected a 100% JSA, which pays $2,816.38 a month.  If reasonable, up-to-date assumptions had been applied when Mr. Brown retired, his benefit would have been $2,997.38, $181 or approximately 6.5% more per month.  By using the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Brown suffered past damages (without interest) of $13,575 and the present value of his future damages is $35,653.70 for a total of $49,228.70.

80.     Plaintiff Ronnie Suveg retired when he was 61 years and 10 months old with an accrued SLA of $2,494.22.  He selected a 75% JSA, which pays $2,070.95 a month. If reasonable, up-to-date assumptions had been applied when Mr. Suveg retired, his benefit would be $2,184.15, $113.20 or approximately 5.5% more per month.  By using the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Suveg suffered past damages (without interest) of $7,371 and the present value of his future damages is $20,303.84 for a total of $27,674.84.

81.     Plaintiff Joseph Bobertz retired when he was 62 years and 7 months old with an accrued SLA of $4,313.33. He selected a 50% JSA, which pays $3,838.86 a month. If reasonable, up-to-date assumptions had been applied when Mr. Bobetz retired, his benefit would be $3,970.52, $131.66 or approximately 3.5% more per month.  By using the 1983 GAM/6% instead of reasonable, up-to-date assumptions,

31

Mr. Bobertz suffered past damages (without interest) of $3,554.82 and the present value of his future damages is $23,211.78 for a total of $26,766.60.

82.     According to the Plans' most recent Forms 5500, the actuarial present values of the accumulated benefits under the Retirement Plan and Pension Plan were approximately $17 billion and $5 billion, respectively.  Discovery will likely show that Defendants' use of unreasonable actuarial assumptions deprives retirees and their spouses out of tens of millions of dollars.

83.     Because the Plans used grossly outdated, unreasonable mortality tables throughout the Class Period, the benefits paid to Participants and beneficiaries who receive JSAs are ***not*** actuarially equivalent to the SLAs they earned as of their retirement date in violation of ERISA § 205, 29 U.S.C. § 1055.  Rather, the benefits payable under these forms are much lower than they should be.

84.     Plaintiffs are participants in the Retirement Plan who are receiving benefits calculated using the 1983 GAM/6%.  Because their benefits were calculated using outdated, unreasonable mortality tables, Plaintiffs have been harmed because they are receiving less each month than they would have received if reasonable, up-to-date actuarial assumptions had been used.  Plaintiffs, along with other class members, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

## CLASS ACTION ALLEGATIONS

85.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class")

defined as follows:

> All participants in and beneficiaries of the Plans who
> began receiving a JSA or QPSA from February 1, 2014 to
> the date of judgment in this case that was calculated using:
> (1) the 1983 GAM/6%; (2) the 1983 GAM/7%; (3) the UP-
> 84/7%; and (4) the UP-84/8%. Excluded from the Class
> are Defendants and any individuals who are subsequently
> to be determined to be fiduciaries of the Plans.

86.    The members of the Class are so numerous that joinder of all members

is impractical.   Upon information and belief, the Class includes thousands of

persons. According to the most recent Forms 5500, the Retirement Plan and the

Pension Plan had 37,389 and 17,664 participants receiving payment at the end of

2018, respectively.

87.    Plaintiffs' claims are typical of the claims of the members of the Class

because Plaintiffs' claims and the claims of all Class members arise out of the same

policies and practices as alleged herein, and all members of the Class are similarly

affected by Defendants' wrongful conduct.

88.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether the Plans' formulae for calculating JSAs provide benefits that are actuarially equivalent to SLAs;

B.    Whether the Plans' actuarial assumptions are reasonable;

C.    Whether the Plans should be reformed to comply with ERISA; and

D.    Whether Plaintiffs and Class members should receive additional benefits.

89.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

90.    This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status

is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

91.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

92.    In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

93.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

94.     The Plans improperly reduce JSAs for Participants and beneficiaries below the amounts that they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires.

95.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

96.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies for calculating JSAs violate ERISA because they do not provide an actuarially equivalent benefit in violation of ERISA § 205, 29 U.S.C. § 1055.

97.     Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of JSA benefits previously paid under the Plans;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

36

(e)    disgorgement of profits earned on amounts wrongfully withheld;

(f)    a constructive trust;

(g)    an equitable lien;

(h)    an injunction against further violations; and

(i)    other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
### (ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))

98.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

99.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

100.    The Plans improperly reduce annuity benefits for Participants who select JSAs below what those Participants would have received if those benefits were actuarially equivalent to an SLA, as ERISA requires. By not providing an actuarially equivalent benefit, Defendants have violated ERISA § 205, 29 U.S.C. § 1055.

37

101.    Plaintiffs are entitled to reformation of the Plans to require Defendants to provide actuarially equivalent benefits.

102.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

103.    Plaintiffs are entitled to recover actuarially equivalent benefits, to enforce their rights to the payment of past and future actuarially equivalent benefits, and to clarify their rights to future actuarially equivalent benefits under the Plans following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

104.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

105.    The Committees are named fiduciaries of the Plans.

106.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

107. The Committees, and the members that serve on them, are fiduciaries for the Plans because they exercised discretionary authority or control respecting the management of the Plans and disposition of their assets. In particular, the Committees have authority or control over the amount and payment of benefits from the Plans' assets by setting the actuarial assumptions the Plans used, and continue to use, to calculate JSA benefits.

108. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.

109.   The Plans are not consistent with ERISA because they use the 1983 GAM/6%, UP-84/7%, UP-84/8% and 1983 GAM/7% to calculate benefits. As a result, the Plans' calculation of JSA benefits are not actuarially equivalent resulting in Participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

110.   In following the terms of the Plans, which did not conform with ERISA, the Committees exercised their fiduciary duties and control over the assets of the Plans in breach of their fiduciary duties.

111.   ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committees to pay benefits that were not actuarially equivalent in violation of ERISA, UPS breached its fiduciary duty to supervise and monitor the Committees.

112.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

113.   Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plans' established methodologies for calculating JSAs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value.

114.   Plaintiffs further seek orders from the Court providing a full range of equitable relief, including but not limited to:

(a)   re-calculation, correction, and payment of actuarially equivalent JSA benefits previously paid under the Plans;

(b)   an "accounting" of all prior benefits and payments;

(c)   a surcharge;

(d)   disgorgement of amounts wrongfully withheld;

(e)   disgorgement of profits earned on amounts wrongfully withheld;

(f)   a constructive trust;

(g)   an equitable lien;

(h)   an injunction against further violations; and

(i)   other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the Plans failed to properly calculate and pay JSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.      Ordering Defendants to bring the Plans into compliance with ERISA, including, but not limited to, reforming the Plans to bring them into compliance with ERISA with respect to calculation of actuarially equivalent JSA benefits;

D.      Ordering Defendants to correct and recalculate JSA benefits that have been paid under the Plans;

E.      Ordering Defendants to provide an "accounting" of all prior payments of JSA benefits under the Plans to determine the proper amounts that should have been paid;

F.      Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plans;

K.      Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Defendants to pay future benefits in accordance with the terms of the Plans, as reformed.

M.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.      Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.

Dated:          January 31, 2020                Respectfully submitted,

                                                *s/ David J. Worley*
                                                David J. Worley
                                                (GA Bar No. 776665)
                                                James M. Evangelista
                                                (GA Bar No. 707807)
                                                Kristi Stahnke McGregor
                                                (GA Bar No. 674012)
                                                **EVANGELISTA WORLEY, LLC**
                                                500 Sugar Mill Road, Ste. 245A
                                                Atlanta, GA 30350
                                                (404) 205-8400
                                                *david@ewlawllc.com*
                                                *jim@ewlawllc.com*
                                                *kristi@ewlawllc.com*

43

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard
Mark P. Kindall
Douglas P. Needham
Oren Faircloth
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  dneedham@ikrlaw.com
Email:  ofaircloth@ikrlaw.com


**BAILEY & GLASSER LLP**
Gregory Y. Porter
Mark G. Boyko
Alexandra S. Serber
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

***Counsel for Plaintiffs***